OPINION
KOCH, Judge.
This appeal concerns the manner in which the Chancery Court for Wayne County divided the marital estate of a couple who had been married for approximately six years. The husband insists that the division was not equitable because the trial court did not divide the parties’ debts according to the same percentages it used to divide their assets. While we disagree with the husband’s premise that the marital debts must be divided in exact proportion to the marital assets, we have determined that the division of the marital estate should be modified because of other errors in the classification and division of the property and in light of the wife’s death while this appeal was pending.[1]
I.
Lee Ann Stringer Howard met Robert Eugene Howard in late 1977 or early 1978 when she showed one of her real estate clients a house listed by one of Mr. Howard’s clients. They began living together in August, 1978 even though Mr. Howard was still married at the time. They were married in October, 1981 after Mr. Howard and his first wife were divorced.
Several years before their marriage, the parties left the real estate business and went to work for one of Mr. Howard’s *771 friends selling toy gliders at shopping malls and fairs around the country. Following a dispute with their supplier, they started their own toy glider business, Howard Manufacturing Company, in 1981.
Both parties played an active role in Howard Manufacturing’s business. They travelled together throughout the United States from Canada to Mexico for six or seven months every year, staying little more than two weeks at any one location. When they were not on the road, Mrs. Howard took care of their itinerary and bookings, and Mr. Howard saw to it that they had an adequate supply of toy airplanes. At its peak, Howard Manufacturing sold gliders to seven or eight other travelling teams, and the Howards earned between $60,000 and $70,000 a year.
However, all was not well with the Ho-wards. The extensive travel was taking its toll on Mrs. Howard, and she became increasingly unhappy with Mr. Howard because she thought he spent too much time hunting and fishing. The parties separated briefly in 1984 or 1985 but reunited when Mr. Howard promised that they would settle down and look for another livelihood that did not require them to travel as much.
In September, 1986, the Howards bought a convenience market in Clifton. Mr. Howard did not favor buying the market because he viewed it as a bad investment and because he thought the glider business was doing well. Nonetheless, he went along with Mrs. Howard because she insisted that she did not want to travel anymore. Although Mrs. Howard was primarily responsible for managing the business, both parties worked at the market. They borrowed money not only to purchase the market but also to improve the property and to operate the business. Their finances were very tight because most the market’s revenues were needed for operating expenses and to repay their sizeable business loans.
The demands of operating the market caused the Howards to cut back on their glider business. However, in the fall of 1987, their precarious financial situation prompted Mrs. Howard to suggest that Mr. Howard should return to selling gliders to earn additional money. Mr. Howard did not go back on the road because he thought he could make as much money trapping raccoons. Unfortunately, the bottom dropped out of the raccoon pelt market, and Mr. Howard earned very little. The failure of Mr. Howard’s trapping enterprise, coupled with the amount of time he spent hunting, finally prompted Mrs. Howard to leave Mr. Howard in December, 1987. When she left, she took $2,400 from the store’s cash register.
Mr. Howard tried to operate the market without Mrs. Howard but with little success. He fell behind on paying the bills and finally was forced to borrow $35,000 from his great aunts and had to sell a boat to obtain money to operate the market and to pay some of the parties’ other debts. Mrs. Howard resumed management of the market in March, 1988 and found that the business was in shambles. She sold some of her assets, including a silver collection, to obtain operating funds for the business. She also removed part of the market’s merchandise and installed pool tables and video games in an attempt to increase the store’s income.
Mrs. Howard took up with another man soon after she left Mr. Howard, and she filed for divorce in March, 1988. Mr. Howard counter-claimed for divorce shortly thereafter, and the trial court heard the proof in May, 1988. While the parties blamed each other for the break up of their marriage and disagreed about how their marital estate should be divided, they were in substantial agreement concerning the value of their marital assets and the amount of their debts.
The trial court granted Mrs. Howard the divorce because Mr. Howard “could have put more effort into [the marriage].” After stating its intent to divide the marital estate “just almost even,” the trial court awarded the market to Mrs. Howard because she had been “the moving factor ... in getting [the businesses] where they are.” However, allocating the parties’ size-able debt presented a more difficult task for the court because it was faced with two *772 conflicting considerations. On one hand, it did not wish to “hurt” Mrs. Howard by giving her the market and its existing debts — which would have forced her to “go head over heels in debt.” On the other hand, it was reluctant to require Mr. Howard to assume the market’s debts “if he s not going to have anything to do with it any more.”
After a lengthy discussion with the parties’ counsel, the trial court divided the marital estate in the following manner:
Husband Wife
Separate Property
(1) Interest in approx. 91
acres — Wayne Co. $ 9,675
(2) Interest in approx. 179 acres — Wayne Co. 17,900
(3) Interest in approx. 465 acres — Hardin Co. 29,063
Marital Propert
(1) Howard Mfg. Co. (molds) 5,000 (1) Howard’s One-Stop Market $125,000
(2) 1979 Ford truck 2,500 (2) Silver collection 3,600
(3) Fishing equipment 2,838 (3) Jewelry 7,000
(4) Jewelry 1,000 (4) Household Furnishings 1,450
(5) Household furnishings 1,850 (5) Guns 1,050
(6) Guns 4,550 (6) Utility trailer 300
(7) Reloading equipment 526 (7) L.L. Bean blanket
(8) Utility trailer 300 (8) End tables
(9) Equity in Naponee, Neb. house 1,500
(10) Freezer and desk
TOTAL PROPERTY $20,064 $138,400
Marital Debts
(1) Credit cards TÜ $ 1,020 First mortgage
[[Image here]]
Ann M. Porter Car note co tO
Bessie Note — deli
Business note Credit cards ®
(6) Business note (42002) 15,000 (5) Business note (42002) -3
TOTAL DEBTS $66,338 $85,220
II.
Mr. Howard does not take issue with the trial court’s division of the marital assets. However, he insists that the trial court has required him to be responsible for a disproportionate share of the parties’ marital debts. We have determined that the distribution of the marital estate is inequitable, not because the trial did not divide the debts in direct proportion to the assets, but because of other classification and allocation errors.
A.
Trial courts have broad discretion in dividing the marital estate in a divorce case. Fisher v. Fisher, 648 S.W.2d 244, 246 (Tenn.1983). Accordingly, their decisions are entitled to great weight on appeal, Edwards v. Edwards, 501 S.W.2d 283, 288 (Tenn.Ct.App.1973), and are presumed to be correct unless the evidence preponderates otherwise. Hardin v. Hardin, 689 S.W.2d 152, 154 (Tenn.Ct.App.1983).
Appellate courts are generally disinclined to disturb a trial court’s distribution of marital property unless it lacks proper evi-dentiary support or results from an error of law or a misapplication of statutory requirements and procedures. However, Tenn.R.App.P. 13(d) requires us to review *773 each record de novo, and, if outcome-affecting errors are found, Tenn.R.App.P. 36(a) requires us to grant the relief to which the parties are entitled.
B.
Tenn.Code Ann. § 36-4-121 (Supp.1988), Tennessee’s statute governing the distribution of marital property, is oriented toward the division of marital assets. It does not deal specifically with marital debts since Tenn.Code Ann. § 36-4-121(b)(l) is not broad enough to include marital debts within its definition of marital property. However, it is difficult to conceive how the courts can equitably divide a marital estate without at least taking the parties debts into consideration. See Newberry v. Newberry, 493 S.W.2d 99, 102 (Tenn.Ct.App.1973).
Most courts now go beyond merely considering the parties’ assets when dividing the marital property and follow the rule that adjudicating the parties’ property interests necessarily involves distributing the parties’ debts as well. Cadwell v. Cadwell, 126 Ariz. 460, 616 P.2d 920, 922 (Ct.App.1980); Beede v. Beede, 186 Conn. 191, 440 A.2d 283, 286 (1982); In re Marriage of Simmons, 101 Ill.App.3d 645, 57 Ill.Dec. 352, 354, 428 N.E.2d 1032, 1034 (1981); In re Marriage of Johnson, 299 N.W.2d 466, 467 (Iowa 1980); McInnis v. McInnis, 62 Or.App. 524, 661 P.2d 942, 943-44 (1983).
In dual property jurisdictions like Tennessee, the courts also distinguish between marital and separate debts and divide only the marital debts. See B. Goldberg, Valuation of Marital Assets § 15.311, at 390 (Supp.1989); 2 H. Clark, The Law of Domestic Relations in the United States § 16.4, at 198 (2d ed.1987). Marital debts are those debts incurred during the marriage for the joint benefit of the parties, Geer v. Geer, 84 N.C.App. 471, 353 S.E.2d 427, 429 (1987), or those directly traceable to the acquisition of marital property. Schweizer v. Schweizer, 301 Md. 626, 484 A.2d 267, 272 (1984). Courts do not generally attempt to divide speculative, unsubstantiated debts or contingent liabilities. Novick v. Novick, 366 N.W.2d 330, 332 (Minn.Ct.App.1985); Wallahan v. Wallahan, 284 N.W.2d 21, 26 (S.D.1979).
Courts should apportion marital debts equitably in much the same way that they divide marital assets. Whitley v. Whitley, 757 P.2d 849, 850 (Okla.Ct.App.1988); B. Goldberg, Valuation of Divorce Assets § 15.311, at 510 (1984). When practicable, the debts should follow the assets they purchased. In re Marriage of Guntren, 141 Ill.App.3d 1, 95 Ill.Dec. 392, 395-96, 489 N.E.2d 1120, 1123-24 (1986); Janik v. Janik, 634 S.W.2d 323, 325 (Tex.Ct.App.1982).
Courts should consider the following factors when they divide marital debts: (1) which party incurred the debt and the debt’s purpose, see Dahlberg v. Dahlberg, 358 N.W.2d 76, 80 (Minn.Ct.App.1984); (2) which party benefitted from incurring the debt, Bodie v. Bodie, 590 S.W.2d 895, 896 (Ky.Ct.App.1979); Shink v. Shink, 140 A.D.2d 506, 528 N.Y.S.2d 847, 849 (1988); and (3) which party is best able to assume and repay the debt. In re Marriage of Vanderbeek, 177 Cal.App.3d 224, 222 Cal.Rptr. 832, 839 (1986); Geldmeier v. Geldmeier, 669 S.W.2d 33, 35 (Mo.Ct.App.1984).
Mr. Howard urges this Court to adopt a rule requiring that marital debts be distributed in the same proportion as the marital assets. Since Mrs. Howard received 87% of the marital assets, he insists that Mrs. Howard should be responsible for 87% of the marital debts. We decline to adopt such a mechanical approach to the distribution of marital estates.
Standardized formulas are ill-suited for property divisions. These divisions must be equitable, not equal or uniform from one case to the next. Whether a particular distribution is fair depends upon the facts and circumstances of each case viewed in light of the factors in Tenn.Code Ann. § 36-4-121(c). Simply requiring that parties’ debt obligations equal the value of the assets received is no substitute for the equitable balancing process traditionally followed by our courts.
*774 C.
We now turn to the particulars of the trial court’s distribution of the Howards’ property and debts.
The Wayne and Hardin County Property
Mr. Howard, together with his mother and his two brothers, owns 179 acres in Wayne County and 465 acres in Hardin County. The trial court classified Mr. Howard’s interest in this property as separate property because it viewed the property as “a gift to Mr. Howard before this marriage.” This finding does not go far enough. The trial court should also have found that the increase in the property’s value during the marriage was marital property subject to division.
Mr. Howard’s mother originally owned the property. She became concerned that her three sons would be forced to sell some of the land to pay the inheritance taxes when she died. In May, 1978, she conveyed the property to a lawyer who, in turn, reconveyed it to her and her sons. As a result of the conveyance, Mr. Howard, his mother, and his two brothers each own a one-forth interest in the property as tenants in common.
Her sons decided that the conveyance gave them an opportunity to provide their mother with some income. Accordingly, they agreed to value the property at $36,-000, and each son agreed to pay his mother $12,000 interest free over a period of years based on a graduated payment schedule. Mr. Howard and Mrs. Howard agree that they used joint funds to make Mr. Howard’s payments to his mother both before and after they were married. The trial court found that they paid Mr. Howard’s mother between $10,000 and $13,600, at least $7,000 of which they paid while married.
Marital property includes the increase in the value during the marriage of a spouse’s separate property if the non-owner spouse contributed substantially to the acquisition, preservation, or appreciation of the property. See Tenn.Code Ann. § 36 — 4—121(b)(1); Ellis v. Ellis, 748 S.W.2d 424, 427 (Tenn. 1988). In the final analysis, the status of property depends not on the state of its record title, but on the conduct of the parties. Jones v. Jones, 597 S.W.2d 886, 887 (Tenn.1979); Langford v. Langford, 220 Tenn. 600, 604, 421 S.W.2d 632, 634 (1967).
The parties used Mrs. Howard’s separate funds as well as their joint funds to pay Mr. Howard’s mother for his interest in the property. Mr. Howard did not treat his interest as separate property because he and Mrs. Howard intended to use a twenty-acre portion of the Hardin County property to build their home. Accordingly, we find that the increase in the value of Mr. Howard’s interest in the Hardin and Wayne County properties is subject to distribution as marital property.
Unfortunately, we are unable to allocate the increase in the value of Mr. Howard’s interest in the property because the record lacks sufficient proof. Mr. Howard’s mother valued the property at $36,000 in May, 1978. However, Mr. Howard conceded that the property had not been appraised at that time and that “what we gave for that wasn’t anything close to what ... it was probably worth.” In December, 1987, he valued his interest in the Wayne County property at $17,900 and in the Hardin County property at $29,063, while Mrs. Howard testified that it was worth considerably more.[2]
On remand, the trial court should hear proof concerning the increase in the value of Mr. Howard’s interest in the Wayne and Hardin County properties. If the property’s value increased during the marriage, the trial court should treat the increase as marital property and should divide it equitably between the parties.
The Business Debts
The Howards accumulated a large amount of debt in connection with their joint businesses. Of the $151,558 of debt *775 proved at trial, $138,694 is traceable directly to the acquisition and operation of Howard Manufacturing Co. and Howard’s One Stop Market.[3] The trial court required Mrs. Howard to be responsible for $74,461 of the business debts,[4] and Mr. Howard $64,233. Approximately $104,876 of the business debts were attributable to the market,[5] while $33,818 are attributable to the manufacturing company.[6]
The Howards’ business debts include joint obligations incurred during the marriage, as well as two loans from Mr. Howard’s great aunts made while Mr. Howard was operating the market. All the debts were incurred for the parties’ mutual benefit. With the exception of the great aunts’ loans, the debts were originally incurred by both parties and were to be repaid from the proceeds from the parties’ two businesses. While Mr. Howard obtained the great aunts’ loans himself, they were used to operate the market and to repay the parties’ personal debts. The parties’ ability to pay the debts depended upon the revenues from their businesses, and the proof showed that their businesses could have generated sufficient income to repay them.
Accordingly, we find that the business debts are marital debts subject to allocation between the parties. They should have followed the businesses for which they were incurred. While we find no fault with the trial court’s decision to award the manufacturing company to Mr. Howard and the market to Mrs. Howard, we find that the trial court required Mr. Howard to assume a disproportionate share of the debt associated with the market.[7]
D.
The trial court and the parties discussed the possibility of selling the market in order to liquidate as many of the marital debts as possible. Even though the trial court appeared to favor this idea, it finally decided not to sell the market because Mrs. Howard feared that a forced sale would bring less than what the market was worth. She also wanted to keep the market because she viewed it as her only source of income.
Mrs. Howard’s death has removed the basis for the trial court’s decision not to sell the market. Future income is no longer a consideration, and in any event, the market will probably be sold as part of the administration of her estate. Therefore, on remand, the trial court is directed to enter an order pursuant to Tenn.Code Ann. § 36-4-121(a) directing that the market be sold and defining the conditions for the sale. The trial court should also direct that the proceeds from the sale be used to liquidate the parties’ debts in the following order: (1) the mortgage; (2) the deli-case note; (3) the joint ninety-day notes; and (4) the loans from Mr. Howard’s great aunts.
Mr. Howard shall be responsible for any of the parties’ unpaid marital debts that remain unpaid after the proceeds- from the sale of the market have been exhausted. The trial court may, if appropriate, offset the value of Mrs. Howard’s share in the increased value of the Wayne and Hardin County properties by the amount of the remaining marital debts Mr. Howard is required to repay after the proceeds of the sale of the market are exhausted. Mrs. Howard’s estate will remain responsible for any balance remaining on her car note, as well as for her credit card debts and all other debts she incurred after the entry of the divorce decree. Mr. Howard remains responsible for his credit card debts and all *776 the debts attributable to Howard Manufacturing Co.
III.
We affirm the trial court’s judgment as modified herein and remand the case for further proceedings consistent with this opinion. The parties or their sureties shall pay the costs of this appeal in equal proportions for which execution, if necessary, may issue.
CANTRELL and FRANKS, JJ., concur.

. Mrs. Howard died in an automobile accident on May 8, 1989, while this appeal was pending. Her death does not extinguish this appeal. By a separate order, we have granted her counsel’s motion to be substituted as her administrator ad litem pursuant to the trial court's September 15, 1989 order.

. Mrs. Howard testified that the property was worth $358 per acre. If she is correct, the Wayne County property would be worth $64,082 and the Hardin County property would be worth $166,470.

. The remaining $12,864 consisted of $4,887 in personal debts and $7,977 in debts that could not be accounted for.

. The trial court also required Mrs. Howard to be responsible for the debts that could not be accounted for.

. This amount includes: $73,005 (mortgage balance); $1,456 (deli note); $10,000 (Pitts loan); and $20,415 (Porter loan).

. This amount includes: $15,000 (ninety-day note); $1,427 (Howard accounts payable); $13,-891 (ninety-day note); and $3,500 (Porter loan).

. Mr. Howard's debt obligations substantially exceeded the total amount of the payments the parties made to Mr. Howard’s mother for the Wayne and Hardin County properties.